T.C. Memo. 2010-3

UNITED STATES TAX COURT

FRANCIS J. AND JEANNE M. VLOCK, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 13443-07.                    Filed January 5, 2010.

<u>Frank W. Pechacek, Jr.</u>, and <u>Jamie L. Cox</u>, for petitioners.

<u>James A. Kutten</u> and <u>Stephen A. Haller</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

CHIECHI, <u>Judge</u>:  Respondent determined the following defi-
ciencies in, and accuracy-related penalties under section
6662(a)[1] on, petitioners' Federal income tax (tax):

---

[1]All section references are to the Internal Revenue Code
(Code) in effect for the years at issue.  All Rule references are
to the Tax Court Rules of Practice and Procedure.

| Year | Deficiency | Accuracy-Related Penalty Under Sec. 6662(a) |
|------|-----------|---------------------------------------------|
| 2003 | $33,492 | $6,698.40 |
| 2004 | 23,561 | 4,712.20 |
| 2005 | 31,866 | 6,373.20 |

The issues remaining for decision are:

(1) Are petitioners entitled to deduct under section 162(a) for each of their taxable years 2003 through 2005 certain amounts that petitioner Francis J. Vlock paid to a certain corporation? We hold that they are not.

(2) Are petitioners entitled to deduct under section 162(a) for their taxable year 2003 certain amounts that they claim petitioner Francis J. Vlock paid to two of their children for services rendered? We hold that they are not.

(3) Are petitioners liable for each of their taxable years 2003 through 2005 for the accuracy-related penalty under section 6662(a)? We hold that they are.

## FINDINGS OF FACT

Some of the facts have been stipulated and are so found except as stated herein.

At the time petitioners filed the petition in this case, they resided in Nebraska.

Mr. Vlock's Insurance Business

From at least 1978 to the time of the trial in this case, petitioner Francis J. Vlock (Mr. Vlock)[2] served as an insurance representative of one or more insurance companies. As an insurance representative, Mr. Vlock sold insurance and certain other financial products, such as variable annuities and other securities, in several States. From 2000 to the time of the trial in this case, Mr. Vlock primarily represented New York Life Insurance Co. (New York Life). From 2002 to the time of the trial in this case, Mr. Vlock was an independent contractor of New York Life and operated his business (Mr. Vlock's insurance business) as a sole proprietorship.

From 1975 until 2002, petitioner Jeanne M. Vlock (Ms. Vlock) spent most of her time raising and caring for petitioners' four children. Before 2002, Ms. Vlock had been involved sporadically in Mr. Vlock's insurance business and had occasionally provided certain unidentified services to Mr. Vlock's insurance business.

In June 2000, Mr. Vlock underwent hip surgery, which required him to spend several months recovering. In order to maintain Mr. Vlock's insurance business during that period of recovery, Mr. Vlock worked primarily at petitioners' personal

---

[2]In referring to Mr. Vlock, the record refers interchangeably to Francis J. Vlock, F. Joseph Vlock, Joseph Vlock, and Joe Vlock.

residence at South 167th Circle, Omaha, Nebraska (petitioners'
residence).

In 2000, Mr. Vlock and New York Life entered into a contract
whereby Mr. Vlock became a so-called district agent of New York
Life.  As such, Mr. Vlock, inter alia, was responsible for
hiring, training, and developing individuals to become agents for
New York Life (agents-in-training).  In exchange for his services
as a district agent, Mr. Vlock was entitled to certain commis-
sions on the sales of New York Life insurance products by the
agents-in-training.  Mr. Vlock treated the agents-in-training
that he hired in his capacity as a New York Life district agent
as independent contractors.

Starting around 2000, Mr. Vlock acquired as clients approxi-
mately 2,500 to 3,000 individuals (additional clients) who had
been clients of certain other agents of New York Life who had
died or retired.  Those additional clients nearly doubled the
total number of clients of Mr. Vlock's insurance business.

While Mr. Vlock was recovering from his hip surgery and was
acquiring the additional clients, he decided that he needed
additional assistance in order to maintain and improve Mr.
Vlock's insurance business.  Around 2000 or 2001, Mr. Vlock
discussed with Ms. Vlock whether she was willing to become more
involved in Mr. Vlock's insurance business in order to assist him
in servicing additional clients and obtaining new clients.  Ms.

Vlock was open to that possibility because petitioners' children no longer required her full-time care and attention. At a time between around mid-2000 and the end of 2001, petitioners agreed that Ms. Vlock was to provide to Mr. Vlock certain assistance in marketing Mr. Vlock's insurance business and servicing its clients.

From 2002 through the summer of 2006, Mr. Vlock operated Mr. Vlock's insurance business in office space that he leased at 6901 Dodge Street, Omaha, Nebraska (Dodge Street office). In the summer of 2006, Mr. Vlock terminated the lease with respect to that office and moved Mr. Vlock's insurance business to office space that New York Life owned at Valmont Plaza, Omaha, Nebraska.

During 2003 through 2005, the years at issue, Mr. Vlock employed at least one or more of the following individuals in Mr. Vlock's insurance business: Paul Jensen, Shirley Schmidt, and Kiran Khajuria. During those years, those employees performed their respective duties for Mr. Vlock's insurance business at the Dodge Street office.

Paul Jensen, whom Mr. Vlock employed on a full-time basis during 2003 and part of 2004, served as a receptionist for Mr. Vlock's insurance business and also was responsible for performing certain administrative and secretarial tasks for that business. Those tasks included (1) scheduling certain appointments for Mr. Vlock, (2) creating files for certain new clients and

certain prospective clients, (3) managing interns that Mr. Vlock hired, (4) maintaining office equipment used at the Dodge Street office, and (5) preparing newsletters and other mailings. During 2003 and 2004, Mr. Vlock paid to Paul Jensen total wages of $29,475.84 and $19,466.56, respectively, and reported those amounts in Forms W-2, Wage and Tax Statements (Forms W-2), that he issued to him for those respective years.

Shirley Schmidt, whom Mr. Vlock employed on a part-time basis during each of the years at issue, was responsible for performing certain administrative and financial tasks for Mr. Vlock's insurance business. Those tasks included (1) payroll administration, (2) handling certain calls from clients, (3) preparing disclosure documents and compliance materials, (4) processing checks, executing wire transfers, and conducting certain other financial transactions, and (5) preparing certain tax reporting materials such as Forms W-2 and Forms 1099-MISC, Miscellaneous Income (Forms 1099-MISC). During 2003, 2004, and 2005, Mr. Vlock paid to Shirley Schmidt total wages of $17,770, $17,578, and $14,072, respectively, and reported those amounts in Forms W-2 that he issued to her for those respective years. In addition to paying those wages to Shirley Schmidt, Mr. Vlock paid her total nonemployee compensation of $2,320.08, $2,087.27, and $925.41 during 2003, 2004, and 2005, respectively, and reported

those amounts in Forms 1099-MISC that he issued to her for those respective years.

Kiran Khajuria, whom Mr. Vlock employed on a part-time basis during 2005, was responsible for performing various tasks for Mr. Vlock's insurance business. Those tasks included (1) maintaining prospectuses for the various financial products that Mr. Vlock sold to clients, (2) maintaining computer equipment at the Dodge Street office, (3) installing software on the computer system utilized at the Dodge Street office, and (4) backing up that computer system and maintaining all backup files. During 2005, Mr. Vlock paid to Kiran Khajuria total wages of $1,383 and reported that amount in Form W-2 that he issued to that individual for that year.

During 2004 and 2005, Mr. Vlock also hired Richard Ness and Joaquin Wilwayco to provide services to Mr. Vlock's insurance business as independent contractors. During those years, Richard Ness assisted Mr. Vlock's insurance business with, inter alia, training staff and identifying and developing new markets for that business's insurance and financial products. During 2004 and 2005, Mr. Vlock paid to Richard Ness total nonemployee compensation of $3,000 and $8,000, respectively, and reported those amounts in Forms 1099-MISC that he issued to him for those respective years.

During 2004, Joaquin Wilwayco provided to Mr. Vlock's insurance business certain software training and assisted Mr. Vlock with certain presentations and educational seminars. During 2004, Mr. Vlock paid to Joaquin Wilwayco total nonemployee compensation of $500 and reported that amount in Form 1099-MISC that he issued to him for that year.

From 2002 through October 2005, Ms. Vlock worked 30 to 50 hours per week performing a number of services for Mr. Vlock's insurance business. Those services included (1) preparing and distributing materials relating to certain seminars and certain programs that Mr. Vlock's insurance business offered to its clients and potential clients; (2) organizing speakers, venues, itineraries, and other logistics for those seminars and those programs; (3) receiving and processing certain calls from some clients of Mr. Vlock's insurance business regarding their accounts; (4) sorting mail delivered to petitioners' residence between personal mail and mail relating to Mr. Vlock's insurance business; (5) scheduling for Mr. Vlock certain appointments with some clients and some potential clients of Mr. Vlock's insurance business; (6) arranging and tracking certain medical appointments for some clients of Mr. Vlock's insurance business where such appointments were prerequisites in order to buy certain insurance products; (7) handling home entertainment and hospitality for certain clients of Mr. Vlock's insurance business; (8) processing

certain claims for benefits; and (9) entering into Mr. Vlock's insurance business's database system certain account information for some of the additional clients and organizing and maintaining relevant files with respect to those clients. Beginning in October 2005, Ms. Vlock reduced the number of hours that she worked each week for Mr. Vlock's insurance business to about 30 hours.

Mr. Vlock prepared the following documents with respect to Mr. Vlock's insurance business: (1) A document dated December 2002 and entitled "Annual Business Plan for Joe Vlock, CLU, ChFC & Associates, 1729 South 167 Circle, Omaha, NE 68130" (December 2002 annual business document); (2) a document dated January 2004 and entitled "Annual Business Plan for Joe Vlock, CLU, ChFC & Associates, 1729 South 167 Circle, Omaha, NE 68130" (January 2004 annual business document); and (3) a document dated January 2005 and entitled "2005 Business Plan, F. Joseph Vlock, CLU, ChFC & Richard L. 'Rick' Ness, LUTCF, New York Life" (January 2005 annual business document). (We shall refer collectively to the December 2002 annual business document, the January 2004 annual business document, and the January 2005 annual business document as the Vlock insurance business annual business documents.)

The second page of the December 2002 annual business document (December 2002 annual business document second page) was

entitled "JOE VLOCK 2002 BUSINESS PLAN, PERFORMED BY VLOCK/HAMMOND" and stated:

Specific Goals for 2002

1. Chairman's Council

2. Recreation Time (Family)

3. Education

4. Consistent Growth

5. Prioritize Phone List

6. Keep Notes in File Neat/Clean up Files

7. Workable Plan

8. Creative Time

9. Time Management

The December 2002 annual business document second page was the only page on which Mr. Vlock referred in the December 2002 annual business document to "VLOCK/HAMMOND".[3]  In the December 2002 annual business document, Mr. Vlock did not set forth any specific goals that he expected Vlock and Hammond to accomplish, or any specific tasks that he expected Vlock and Hammond to perform, with respect to Mr. Vlock's insurance business.

In the January 2004 annual business document, Mr. Vlock did not refer to Vlock and Hammond.  Instead, Mr. Vlock referred in that document to "Jeanne" (i.e., Ms. Vlock) the following four

_____

[3]We believe that the reference to "VLOCK/HAMMOND" is to Vlock and Hammond, Inc. (discussed below).  (We shall refer to Vlock and Hammond, Inc., as Vlock and Hammond.)

times: (1) In a section entitled "**Opportunities**", Mr. Vlock stated that "Jeanne is committed to co-ordinate all marketing and case preparation and public relations with clients"; (2) in a section entitled "**Threats**", Mr. Vlock asked: "Can Joe & Jeanne work together"; and (3) in a section entitled "**Key Strategies for Planning Year**", Mr. Vlock stated (a) that he was to "**Spend** 2-3 hours with Jeanne coordinating monthly seminars, case presentations and client appreciation workshops", and (b) "**Jeanne** to coordinate center of influence appointments." Mr. Vlock did not indicate in the January 2004 annual business document that the four references in that document to "Jeanne" were to Ms. Vlock acting on behalf of Vlock and Hammond. Nor did Mr. Vlock refer in the January 2004 annual business document to "Jeanne" in such a way as to establish that, if and when Ms. Vlock were to perform services for Mr. Vlock's insurance business, she would be acting on behalf of Vlock and Hammond.

Mr. Vlock did not refer to Vlock and Hammond or to Ms. Vlock in the January 2005 annual business document. In that document, Mr. Vlock set forth goals and objectives for Mr. Vlock, Richard Ness, and a person identified in that document as "Jess". In the January 2005 annual business document, Mr. Vlock also set forth analyses of the strengths and weaknesses of, the opportunities for, and the threats to Mr. Vlock and Richard Ness. In that document, Mr. Vlock did not assign any tasks or goals to Vlock

and Hammond or to Ms. Vlock acting on behalf of Vlock and Hammond and did not indicate that Vlock and Hammond or Ms. Vlock acting on behalf of Vlock and Hammond was to assist Mr. Vlock, Richard Ness, or "Jess" in achieving any of the goals and objectives that Mr. Vlock set forth in that document for each of them.

During 2003, an unidentified individual prepared two documents (business potential documents), each of which was entitled "ASSESS YOUR BUSINESS POTENTIAL REPPORT [sic] - 2003, JOE VLOCK, CLU, CHFC/VLOCK & HAMMOND". Each of those titles contained the only reference to Vlock and Hammond in each of those documents. Each of the business potential documents contained several statements that were addressed directly to Mr. Vlock, including the following:

> Joe, here is my summary of your needs for coaching and activities to go to the next level. All of these actions and systems could be set up through customized coaching.
>
> OVERVIEW OF ACTIONS NEEDED AND YOUR COACHING NEEDS
>
> - Clear Goals: for 1 year and 1 quarter
> - Clear Marketing Systems: Target market business/estate, build strong client centers of Influence, use your speaking skills.
> - Better staff utilization: train Jean[4] to be your marketing coordinator.
> - Polish your office systems: have less service interruptions.
> - Better time management: plan and coordinate your day, week, and month; deal with your time wasters.

---

[4]We believe that the reference to "Jean" is to Ms. Vlock.

- Get out of your comfort zone:  stay "focused" on your insurance business.
- Increase your sales activity and case size through target marketing.
- Joe, good things are ahead for you and your staff.  You can go to the next level.

The reference to "Jean" in the above-quoted statement was the only reference to Ms. Vlock in each of the business potential documents.  The author of each of those documents did not indicate therein that each such reference was to Ms. Vlock acting on behalf of Vlock and Hammond.  Nor did the author refer in either of the business potential reports to Ms. Vlock in such a way as to establish that, if and when Ms. Vlock were to perform services for Mr. Vlock's insurance business, she would be acting on behalf of Vlock and Hammond.

Petitioners filed Form 1040, U.S. Individual Income Tax Return, for each of their taxable years 2003 (2003 return), 2004 (2004 return), and 2005 (2005 return).  Frank Pechacek (Mr. Pechacek), an attorney at the firm of Willson & Pechacek, P.L.C., prepared each of those returns for petitioners.[5]  Petitioners attached to each of the 2003 return, the 2004 return, and the 2005 return Schedule C, Profit or Loss From Business (Schedule C).  In each of those schedules, Mr. Vlock reported income derived from, and claimed expenses with respect to, Mr. Vlock's insurance business.

---

[5]Mr. Pechacek is the lead attorney who represents petitioners in this case.

In Schedule C that petitioners attached to the 2003 return
(2003 Schedule C), Mr. Vlock claimed the following expenses,
inter alia, with respect to Mr. Vlock's insurance business:

| Description | Amount |
| --- | --- |
| Rent--Dodge Street office | $20,096 |
| Wages | 47,246 |
| Contract labor | 5,920 |
| Management services | 120,000 |

The amount that Mr. Vlock claimed as a deduction for contract
labor in the 2003 Schedule C included a total of $3,600 that Mr.
Vlock reported as nonemployee compensation in respective Forms
1099-MISC for taxable year 2003 that he issued to petitioners'
daughters Sarina and Jennifer (collectively, Vlock daughters).
In those respective forms, Mr. Vlock claimed that he paid as
"Nonemployee compensation" $1,400 and $2,200 to Sarina and
Jennifer, respectively.

In Schedule C that petitioners attached to the 2004 return
(2004 Schedule C), Mr. Vlock claimed the following expenses,
inter alia, with respect to Mr. Vlock's insurance business:

| Description | Amount |
| --- | --- |
| Rent--Dodge Street office | $18,972 |
| Wages | 37,044 |
| Contract labor | 4,000 |
| Management services | 120,000 |

In Schedule C that petitioners attached to the 2005 return (2005 Schedule C), Mr. Vlock claimed the following expenses, inter alia, with respect to Mr. Vlock's insurance business:

| Description | Amount |
|---|---|
| Rent--Dodge Street office | $20,696 |
| Wages | 24,380 |
| Management services | 109,000 |

The respective deductions that petitioners claimed with respect to management services in the 2003 Schedule C, the 2004 Schedule C, and the 2005 Schedule C represented the respective amounts that petitioners claimed that Mr. Vlock paid to Vlock and Hammond during 2003, 2004, and 2005, respectively.

Vlock and Hammond

As discussed above, Ms. Vlock wanted to help Mr. Vlock with Mr. Vlock's insurance business, and between around mid-2000 and the end of 2001 petitioners agreed that Ms. Vlock was to provide to Mr. Vlock's insurance business certain assistance in marketing that business and servicing some of its clients. However, petitioners wanted Ms. Vlock to do so in a manner that would achieve certain tax-avoidance objectives (discussed below). In an attempt to achieve those objectives, on December 27, 2001, Ms. Vlock incorporated Vlock and Hammond under the laws of the State of Nebraska. From the incorporation of Vlock and Hammond throughout the years at issue, Ms. Vlock was its sole stockholder

and its sole director, and the following individuals served as its officers:

> Jeanne M. Vlock     President and Treasurer
> Angela Vlock[6]     Vice President
> Francis J. Vlock    Secretary

One of the tax-avoidance objectives of petitioners in having Ms. Vlock incorporate Vlock and Hammond was that they did not want Ms. Vlock to receive cash wages for the services that she was to perform for Mr. Vlock's insurance business because she would have to report any such wages as income and pay tax on that income. Another tax-avoidance objective of petitioners in having Ms. Vlock incorporate Vlock and Hammond was to have Vlock and Hammond pay virtually all of petitioners' personal living ex-penses with funds which Mr. Vlock was to pay to Vlock and Hammond and for which petitioners were to claim tax deductions.

In an attempt to bolster the chances that they would succeed in achieving their tax-avoidance objectives, petitioners created a paper trail relating to Vlock and Hammond.

The Purported Management Agreement

On January 1, 2002, Mr. Vlock and Vlock and Hammond executed a document entitled "MANAGEMENT CONSULTING AGREEMENT" (purported management agreement). Ms. Vlock executed that document on

---

[6]Angela Vlock is petitioners' oldest child.

behalf of Vlock and Hammond.  The purported management agreement

stated in pertinent part:

> **1.  Management Services.**  [Mr.] Vlock hereby
> contracts with [Vlock and Hammond] * * * to perform
> management and consulting services in accordance with
> the terms and conditions set forth in this Agreement.
>
> [Vlock and Hammond] * * * will consult with [Mr.]
> Vlock concerning matters related to the management and
> operation of [Mr. Vlock's insurance business] * * *,
> his financial policies, and generally any matter aris-
> ing out of the business affairs of [Mr.] Vlock.  The
> management services shall include, but not be limited
> to, advice and services regarding marketing, account-
> ing, technical and computer support, and personnel
> matters.  The management services regarding personnel
> matters shall include advice regarding employment
> control, supervision, hiring and discharge of employees
> and independent contractors hired by [Mr.] Vlock.
>
> [Vlock and Hammond] * * * may provide advice with
> respect to employee benefits and enter into negotia-
> tions regarding same on behalf of [Mr.] Vlock.  [Vlock
> and Hammond] * * * will also provide advice with re-
> spect to the purchase and/or lease of equipment and
> supplies relating to [Mr.] Vlock's business.
>
>     *     *     *     *     *     *     *
>
> **3.  Payment to Consulting Company.**  [Mr.] Vlock
> shall pay [Vlock and Hammond] * * * the sum of
> $10,000.0 [sic] per month on or before the first day of
> each month.  [Mr.] Vlock shall not be required to pay
> any other fee or benefit to [Vlock and Hammond] * * *
> for services rendered.  [Vlock and Hammond] * * * may
> submit reasonable out-of-pocket expenses from time to
> time to [Mr.] Vlock which will be reimbursed only upon
> [Mr.] Vlock['s] approval.
>
> **4.  Duties of Consulting Company.** [Vlock and
> Hammond] * * * shall furnish consulting and management
> services and render advice to [Mr.] Vlock at all times
> reasonably requested by [Mr.] Vlock, subject, however,
> to the following conditions:
>
>     *     *     *     *     *     *     *

g. [Vlock and Hammond] * * * shall provide adequate office space, office equipment and furnishings, general liability insurance, all office supplies, adequate office staff, all telephone and reception services, all reasonable subscriptions and all postage, correspondence materials and typing services to [Mr.] Vlock.

In arriving at the $10,000 amount stated in section 3 (quoted above) of the purported management agreement, neither Mr. Vlock nor Ms. Vlock consulted an accountant, business manager, or compensation expert. However, Ms. Vlock consulted Mr. Pechacek, the attorney whom petitioners retained for the purpose of assisting Ms. Vlock in incorporating Vlock and Hammond and drafting certain documents for it, including, inter alia, the purported management agreement.[7]

On October 25, 2005, Mr. Vlock and Vlock and Hammond executed an amendment (2005 amendment) to the purported management agreement. That amendment reduced the amount stated in section 3 of that purported agreement from $10,000 per month to $7,500 per month.

_____

[7]The record does not establish what Mr. Pechacek, who was the preparer of petitioners' 2003 return, 2004 return, and 2005 return and who is the lead attorney representing petitioners in this case, see supra note 5, told Ms. Vlock when she consulted him. Before the commencement of the trial in this case, petitioners waived any potential conflicts of interest regarding Mr. Pechacek, who was not called as a witness at that trial.

At the times indicated,[8] Mr. Vlock paid to Vlock and Hammond the following amounts (Mr. Vlock's payments to Vlock and Hammond):[9]

| Time | Amount |
|------|--------|
| January 2003 | $5,000.00 |
| Feb. 6, 2003 | 10,000.00 |
| Mar. 4, 2003 | 10,000.00 |
| Apr. 9, 2003 | 10,000.00 |
| May 2003 | 10,000.00 |
| June 10, 2003 | 10,000.00 |
| July 21, 2003 | 5,000.00 |
| Sept. 3, 2003 | 10,000.00 |
| October 2003 | 10,000.00 |
| November 2003 | 10,000.00 |
| Nov. 29, 2003 | 11,100.00 |
| Dec. 6, 2003 | 10,000.00 |
| 2003 Total | $111,100.00 |

_____

[8]The record does not establish the days in all of the months during the years at issue on which Mr. Vlock made payments to Vlock and Hammond.

[9]Petitioners concede that they are unable to establish that Mr. Vlock made all of the payments to Vlock and Hammond that they claimed as the respective deductions in the 2003 Schedule C, the 2004 Schedule C, and the 2005 Schedule C. They also concede that during each of the years at issue Mr. Vlock paid to Vlock and Hammond a total amount that was less than (1) the annual total of the monthly amount stated in sec. 3 of the purported management agreement and (2) the amount that petitioners claimed as a deduction for management services in Schedule C included with the return that they filed for each of those years.

| | |
|---|---|
| Jan. 5, 2004 | $10,000.00 |
| Feb. 5, 2004 | 10,000.00 |
| Mar. 29, 2004 | 10,000.00 |
| Apr. 13, 2004 | 10,000.00 |
| May 1, 2004 | 10,000.00 |
| June 11, 2004 | 10,000.00 |
| July 7, 2004 | 10,000.00 |
| Aug. 9, 2004 | 10,000.00 |
| Sept. 10, 2004 | 10,000.00 |
| Nov. 1, 2004 | 10,000.00 |
| 2004 Total | $100,000.00 |
| | |
| January 2005 | $10,000.00 |
| February 2005 | 20,000.00 |
| April 2005 | 10,000.00 |
| May 2005 | 10,000.00 |
| June 2005 | 10,000.00 |
| July 2005 | 5,000.00 |
| August 2005 | 10,000.00 |
| September 2005 | 10,000.00 |
| October 2005 | 10,000.00 |
| November 2005 | 12,873.33 |
| 2005 Total | $107,873.33 |

The Purported Employment Agreement

On January 1, 2002, Ms. Vlock and Vlock and Hammond executed a document entitled "EMPLOYMENT AGREEMENT" (purported employment agreement).  Ms. Vlock executed that document both in her individual capacity and in her capacity as president of Vlock and Hammond.  The purported employment agreement stated in pertinent part:

> An Agreement made between Jeanne M. Vlock of Omaha, Nebraska, herein referred to as Employee and Vlock & Hammond, Inc., whose principal place of business is located at 1729 South 167th Circle, Omaha,

Nebraska [petitioners' residence], herein referred to as Employer.

\*      \*      \*      \*      \*      \*      \*

SECTION 1.

EMPLOYMENT

Employer hereby employs, engages, and hires Employee as an operational supervisor and monitor of a portion of Employer's business, and Employee hereby accepts and agrees to such hiring, engagement and employment, subject to the general supervision and pursuant to the orders, advice and direction of Employer.

Because of certain necessities required for the proper performance of the duties which the Employee must perform for the Employer under this Agreement and because of the benefits and conveniences accruing to the Employer by having the Employee residing on business premises of the Employer, the Employee shall be required to live in the housing furnished by the Employer on the business premises [petitioners' residence] of the Employer.  \* \* \*

\*      \*      \*      \*      \*      \*      \*

SECTION 3.

TERM OF EMPLOYMENT

The term of this Agreement shall be a period of one year, commencing January 1, 2002, and terminating Dec. 31, 2003 [sic], subject however, to prior termination as herein provided.  At the expiration date of Dec. 31, 20023 [alteration in original], this Agreement shall be considered renewed for regular periods of one year provided neither party submits a notice of termination.

\*      \*      \*      \*      \*      \*      \*

## SECTION 6.

## SPECIFIC DESCRIPTION OF CERTAIN DUTIES

While at all times, the Employee will be subject to such additional duties and services as may be required by the Employer, the following are a list of certain specific duties and responsibilities Employee [Ms. Vlock] shall have in performing services for the Employer. The Employee in performing these services shall be on call twenty-four hours a day except for reasonable vacations as the Employer may allow. Duties and responsibilities are to be performed at the location as directed by the Employer above.

(1) To constantly be present in the area of responsibility to deter and guard against vandalism and theft of equipment, tools, buildings, and other property of the Employer.

(2) To maintain watch over the property of the Employer so as to discover and report any damage to any of the Employer's property from wind, fire, freezing, or other catastrophes and to take any other action if possible to minimize said losses.

(3) To be present on the premises so as to immediately detect and report any interruption of electrical service to the facilities of the Employer so as to minimize the possibility of any losses.

(4) To monitor the performance and activities of other Employees of the Employer working on the premises and report to the Employer concerning their activities.

(5) To provide assistance to other Employees of the Employer in case of a breakdown or emergency while operating on the property of the Employer.

  (6) To be present to alert other designated Employees of shipments of materials being received by Employer.

The purported employment agreement contained a section entitled "COMPENSATION OF EMPLOYEE" that stated:

SECTION 4.

COMPENSATION OF EMPLOYEE

  Employer [Vlock and Hammond] shall pay Employee [Ms. Vlock] and Employee shall accept from Employer, in full payment for Employee's services hereunder, minimum compensation at the rate of <u>to be determined later</u>[10] Dollars ($_____) per year, payable _____.  Notwithstanding any language to the contrary, Employer, in its sole discretion, may pay Employee additional compensation from time to time.

At no time during the years at issue did Ms. Vlock or Vlock and Hammond determine a rate of compensation to be paid to Ms. Vlock as stated in section 4 of the purported employment agreement.

<u>Vlock and Hammond's Board of Directors</u>

On January 1, 2002, Vlock and Hammond held a meeting (January 1, 2002 meeting) of its board of directors (Vlock and Hammond board), whose only member was Ms. Vlock.  The minutes of that meeting stated, inter alia, that the Vlock and Hammond board (1) elected officers of Vlock and Hammond, (2) adopted the bylaws of Vlock and Hammond, (3) designated First Westroads Bank as Vlock and Hammond's depository institution, (4) required that

---

[10]The phrase "to be determined later" was handwritten in a blank underlined space in sec. 4 of the purported employment agreement.

Vlock and Hammond's officers and director use their best efforts to operate Vlock and Hammond in such a manner that stock of Vlock and Hammond would qualify as stock under section 1244, (5) accepted Ms. Vlock's offer to purchase stock of Vlock and Hammond and issued to her a certificate representing the number of shares that she purchased, (6) made an election under section 248 with respect to Vlock and Hammond's organizational expenses, (7) authorized Ms. Vlock to pay any expenses resulting from the organization of Vlock and Hammond, and (8) adopted a "Nondiscriminatory Medical and Dental Reimbursement Plan". The minutes of the January 1, 2002 meeting did not reflect that the Vlock and Hammond board discussed at that meeting the purported management agreement and the purported employment agreement that Vlock and Hammond had executed on the date of that meeting. Nor did those minutes reflect that the Vlock and Hammond board discussed at that meeting the nature or the extent of the services (1) that the purported management agreement stated Vlock and Hammond was to provide to Mr. Vlock's insurance business and (2) that the purported employment agreement stated Ms. Vlock was to provide to Vlock and Hammond during any of the years at issue.

On November 22, 2003, Vlock and Hammond held a joint meeting of stockholders of Vlock and Hammond and the Vlock and Hammond board (November 22, 2003 meeting). The minutes of that meeting stated, inter alia, that the Vlock and Hammond board elected

officers of Vlock and Hammond. Those minutes did not reflect that the Vlock and Hammond board discussed at the November 22, 2003 meeting the purported management agreement or the purported employment agreement. Nor did the minutes of that meeting reflect that the Vlock and Hammond board discussed at that meeting the nature or the extent of the services (1) that the purported management agreement stated Vlock and Hammond was to provide to Mr. Vlock's insurance business and (2) that the purported employment agreement stated Ms. Vlock was to provide to Vlock and Hammond during any of the years at issue. The minutes of the November 22, 2003 meeting did not reflect that the Vlock and Hammond board discussed at that meeting that during 2003 Mr. Vlock had failed to pay, or had paid late, certain of the amounts stated in section 3 of the purported management agreement.

On November 16, 2004, Vlock and Hammond held a joint meeting of stockholders of Vlock and Hammond and the Vlock and Hammond board (November 16, 2004 meeting). The minutes of that meeting stated, inter alia, that the Vlock and Hammond board elected officers of Vlock and Hammond. Those minutes did not reflect that the Vlock and Hammond board discussed at the November 16, 2004 meeting the purported management agreement or the purported employment agreement. Nor did the minutes of that meeting reflect that the Vlock and Hammond board discussed at that meeting the nature or the extent of the services (1) that the

purported management agreement stated Vlock and Hammond was to provide to Mr. Vlock's insurance business and (2) that the purported employment agreement stated Ms. Vlock was to provide to Vlock and Hammond during any of the years at issue. The minutes of the November 16, 2004 meeting did not reflect that the Vlock and Hammond board discussed at that meeting that during 2004 Mr. Vlock had failed to pay, or had paid late, certain of the amounts stated in section 3 of the purported management agreement or the purported employment agreement.

On October 25, 2005, Vlock and Hammond held a joint meeting of stockholders of Vlock and Hammond and the Vlock and Hammond board (October 25, 2005 meeting). The minutes of that meeting stated, inter alia, that the Vlock and Hammond board elected officers of Vlock and Hammond. Those minutes did not reflect that the Vlock and Hammond board discussed at the October 25, 2005 meeting the purported management agreement or the purported employment agreement. Nor did the minutes of that meeting reflect that the Vlock and Hammond board discussed at that meeting the 2005 amendment that Vlock and Hammond had executed on the date of that meeting. The minutes of the October 25, 2005 meeting did not reflect that the Vlock and Hammond board discussed at that meeting the nature or the extent of the services (1) that the purported management agreement stated Vlock and Hammond was to provide to Mr. Vlock's insurance business and

(2) that the purported employment agreement stated Ms. Vlock was to provide to Vlock and Hammond during any of the years at issue. Nor did those minutes reflect that the Vlock and Hammond board discussed at that meeting that during 2005 Mr. Vlock had failed to pay, or had paid late, certain of the amounts stated in section 3 of the purported management agreement.

### Certain Payments Made by Vlock and Hammond

Consistent with petitioners' tax-avoidance objectives, Vlock and Hammond (1) did not pay at any time during any of the years at issue any cash wages to Ms. Vlock[11] and (2) paid during each of those years virtually all of petitioners' personal living expenses with funds which Mr. Vlock paid to Vlock and Hammond and for which petitioners claimed tax deductions.[12]

### Certain Payments Made by Vlock and Hammond Relating to Petitioners' Residence

On January 1, 2002, Vlock and Hammond and petitioners executed a document entitled "REAL ESTATE CONTRACT-INSTALLMENTS"

---

[11]From 2002 until the time of the trial in this case, Vlock and Hammond (1) did not file Form 941, Employer's Quarterly Federal Tax Return, for any quarter or Form 940, Employer's Annual Federal Unemployment (FUTA) Tax Return, for any taxable year and (2) did not issue any Form W-2 or Form 1099-MISC.

[12]The parties stipulated the amounts of the personal expenses of petitioners that Vlock and Hammond paid during each of the calendar years 2003, 2004, and 2005, even though Vlock and Hammond had a taxable year ending on November 30. As for certain payments that Vlock and Hammond made to Sarina (discussed below), the parties stipulated the amounts that Vlock and Hammond paid to her during each of its taxable years ended Nov. 30, 2003 through 2005.

(real estate installment document).  That document stated in pertinent part:

IT IS AGREED this 1st day of January, 2002, by and between F. Joseph Vlock and Jeanne M. Vlock, husband and wife, of the County of Douglas, State of ~~Iowa~~Nebraska [alteration in original], Sellers; and Vlock & Hammond, Inc. of the County of Douglas, State of ~~Iowa~~Nebraska [alteration in original], Buyers;

That the Sellers, as in this contract provided, agree to sell to the Buyers, and the Buyers in consideration of the premises, hereby agree with the Sellers to purchase the following described real estate situated in the County of Douglas, State of ~~Iowa~~Nebraska [alteration in original] to-wit:

Lot Twenty-five (25), Pacific Heights Replat I, a Subdivision in Douglas County, Nebraska [petitioners' residence]

* * * upon the terms and conditions following:

1.  TOTAL PURCHASE PRICE.  The Buyers agree to pay for said property the total of $290,000.00 due and payable * * * as follows:

   *     *     *     *     *     *     *

The sum of $2,941.00, principal and interest, per month, commencing with the first payment due on February 1, 2002, in the sum of $2,941.00, principal and interest, on the first day of each and every month thereafter until all principal and interest is paid in full.  Interest shall accrue at the rate of 9% per annum.

Buyer shall have the option to prepay in full or in part at any time without penalty.

The real estate installment document was filed with the Recorder of Deeds for Omaha, Nebraska.  At no time did petitioners execute a deed in favor of Vlock and Hammond with respect to petitioners'

residence.  Petitioners continued to reside in petitioners'
residence after executing the real estate installment document.[13]

When petitioners and Vlock and Hammond executed the real
estate installment document, petitioners' residence was subject
to a mortgage held by CitiMortgage.  At no time did petitioners
notify CitiMortgage that they had executed the real estate
installment document.

Vlock and Hammond did not make all of the monthly payments
to petitioners that the real estate installment document stated
it was to make.  Instead, Vlock and Hammond paid to petitioners
the following amounts on the dates indicated:

---

[13]On June 23, 2006, petitioners and Vlock and Hammond exe-
cuted a document entitled "WARRANTY DEED-JOINT TENANCY" (warranty
deed).  That deed stated in pertinent part:

> For the consideration of $224,900.00 Dollar(s) * * *
> Vlock & Hammond, Inc., * * * and F. Joseph Vlock and
> Jeanne M. Vlock, * * * do hereby Convey to Freddie J.
> Thayer and Connie L. Thayer, * * * Lot Twenty-five
> (25), Pacific Heights Replat I, a Subdivision, as
> surveyed, platted and recorded in Douglas County,
> Nebraska [petitioners' residence]

The warranty deed was recorded with the Recorder of Deeds in
Omaha, Nebraska.  Peabody Title & Escrow Co. prepared a "SELLER'S
CLOSING STATEMENT" that identified petitioners as the sellers of
petitioners' residence and indicated that, after accounting for
all necessary adjustments, petitioners received $179,008.94 in
cash from the sale of petitioners' residence.

| Date | Amount |
|------|--------|
| Apr. 10, 2003 | $8,823 |
| July 6, 2003 | 11,764 |
| Sept. 5, 2003 | 5,882 |
| Oct. 7, 2003 | 2,941 |
| Nov. 4, 2003 | 2,941 |
| Dec. 9, 2003 | 2,941 |
| 2003 Total | $35,292 |
| | |
| Jan. 4, 2004 | $2,941 |
| Feb. 4, 2004 | 2,941 |
| Apr. 12, 2004 | 5,882 |
| June 10, 2004 | 5,882 |
| July 14, 2004 | 2,941 |
| Aug. 8, 2004 | 2,941 |
| Sept. 10, 2004 | 2,941 |
| Oct. 14, 2004 | 2,941 |
| Nov. 6, 2004 | 2,941 |
| 2004 Total | $32,351 |
| | |
| Jan. 4, 2005 | $2,941 |
| Feb. 10, 2005 | 5,882 |
| Mar. 16, 2005 | 2,996 |
| Apr. 16, 2005 | 2,996 |
| May 17, 2005 | 2,996 |
| June 16, 2005 | 2,996 |
| July 15, 2005 | 2,996 |
| Aug. 6, 2005 | 2,996 |
| Sept. 13, 2005 | 2,996 |
| Oct. 5, 2005 | 2,996 |
| Nov. 10, 2005 | 2,996 |
| Dec. 14, 2005 | 2,996 |
| 2005 Total | $38,783 |

(We shall refer to the foregoing amounts that Vlock and Hammond paid to petitioners as the real estate installment document payments.)

In addition to the payments described above, during each of the years at issue Vlock and Hammond paid virtually all of the expenses relating to petitioners' residence. Those expenses included the following amounts that Vlock and Hammond paid during the years indicated for expenses for real property taxes, repairs and improvements (e.g., a sprinkler system, pest management, a refrigerator and other appliances, hardware and other supplies, plumbers and other home repairmen, carpet cleaning, and contractors), housecleaning services, landscaping services, bottled water service, and all utilities (i.e., electric, gas, water, and sewer service, cable television and Internet access, and telephone service):

| | Amount Paid During | | |
|---|---|---|---|
| Category | 2003 | 2004 | 2005 |
| Real property taxes | $3,484.46 | $3,592.96 | $4,113.76 |
| Repairs and improvements | | | |
|   Sprinkler system | 2,300.00 | -- | -- |
|   Pest management | -- | 96.30 | -- |
|   Appliances | 75.29 | 549.68 | 263.79 |
|   Hardware and supplies | 658.67 | 1,523.33 | -- |
|   Repairmen | 2,350.00 | 424.59 | -- |
|   Carpet cleaning | 317.79 | 347.75 | 342.40 |
|   Contractors | -- | 690.00 | -- |
|   Other items | 767.40 | 487.46 | 256.22 |
| Housecleaning services | -- | 150.00 | 285.00 |
| Landscaping services | 246.99 | 1,228.76 | 1,650.38 |
| Bottled water service | 114.37 | 8.56 | 162.20 |
| Utilities | | | |
|   Electric | 1,978.68 | 1,345.12 | 1,353.33 |
|   Gas, water, and sewer | 1,540.39 | 1,667.77 | 1,611.05 |
|   Cable television and<br>    Internet access | 358.98 | 1,160.14 | 1,490.58 |
|   Telephone service | 889.86 | 369.10 | -- |

(We shall refer to the foregoing amounts that Vlock and Hammond paid for virtually all of the expenses relating to petitioners' residence as the personal residence expenses.)

During each of the years at issue, Vlock and Hammond also paid to maintain cellular telephone service for petitioners. During 2003, 2004, and 2005, Vlock and Hammond paid $1,320.98, $1,114.09, and $862.63, respectively, for that service. (We shall refer to the foregoing amounts that Vlock and Hammond paid for cellular telephone service as the cellular telephone expenses).

Certain Payments Made by
Vlock and Hammond Relating to Food

During each of the years at issue, Ms. Vlock purchased food at area grocery stores, including, inter alia, Bakers Grocery Store, Albertsons Grocery Store, and Hy Vee Grocery Store. During each of those years, Vlock and Hammond reimbursed Ms. Vlock for the purchases of food that she made during each such year. Ms. Vlock used the food for which Vlock and Hammond paid to prepare meals for her family and friends. During 2003, 2004, and 2005, Vlock and Hammond reimbursed Ms. Vlock $5,958.20, $6,254.54, and $7,629.02, respectively, for the food that she purchased during those years. (We shall refer to the foregoing amounts that Vlock and Hammond reimbursed Ms. Vlock for food that she purchased as the reimbursed food expenses.)

Certain Payments Made by Vlock and
Hammond Relating to Medical and Dental Expenses

On January 1, 2002, Vlock and Hammond and Ms. Vlock executed a document entitled "NONDISCRIMINATORY MEDICAL AND DENTAL REIM-BURSEMENT PLAN". That document stated in pertinent part:

> the Corporation [Vlock and Hammond] agrees to reimburse you [Ms. Vlock] for all reasonable medical and dental expenses up to the sum of $25,000.00 in any fiscal year * * * which you [Ms. Vlock] and/or members of your immediate family may incur, except such expenses which are covered and are reimbursable to you from any medi-cal, dental, health and/or accident insurance policy insuring you and/or members of your immediate family.

During each of the years at issue, Vlock and Hammond reim-bursed Ms. Vlock for the amounts that petitioners paid as

(1) premiums for a health insurance plan issued by New York Life to Mr. Vlock (NYL health plan) that he maintained to cover himself and his family, (2) copayments to health care providers pursuant to the NYL health plan, and (3) premiums for two long-term care insurance plans covering Mr. Vlock and two such plans covering Ms. Vlock.[14]  (We shall refer collectively to the foregoing amounts that Vlock and Hammond reimbursed Ms. Vlock as the reimbursed medical expenses.)

> ### Certain Payments Made by Vlock and Hammond Relating to Educational Expenses

On January 1, 2003, Vlock and Hammond adopted a document entitled "Educational Assistance Plan" (educational assistance document).  That document stated in pertinent part:

Article II -- Definitions

     *         *         *         *         *         *         *

2.03  "Benefits" means the direct payment or reimbursement of Covered Costs incurred by a Participant for Educational Courses.

     *         *         *         *         *         *         *

2.05  "Covered Costs" means the tuition, fees and similar payments and the cost of books paid for or incurred by a Participant in taking an Educational Course. * * *

---

[14]The record does not establish the total amount that Vlock and Hammond reimbursed Ms. Vlock during each of the years at issue.  As discussed below, Vlock and Hammond claimed deductions for reimbursed medical expenses of $4,595, $6,873, and $997 in the returns that it filed for its taxable years ended Nov. 30, 2003, 2004, and 2005, respectively.

2.06 "Educational Course" means any course taken by a Participant at an Accredited Institution, except for a course that instructs the Participant in any sport, game or hobby.

    \*        \*        \*        \*        \*        \*        \*

2.12 "Participant" means any Employee or Former Employee who has satisfied the eligibility requirements of Section 3.01.

    \*        \*        \*        \*        \*        \*        \*

Article III -- Eligibility

3.01 Every Employee who has completed one Year of Service on the effective date of the Plan and every Former Employee shall automatically become a Participant in the Plan on that date. Each other Employee shall become a Participant in the Plan on the first day of the Plan Year after he has completed one Year of Service.

    \*        \*        \*        \*        \*        \*        \*

Article IV -- Benefits

4.01 Every Participant in the Plan shall be eligible to receive Benefits under the Plan for Covered Costs incurred by the Participant, subject to the limitations of Article V.

    \*        \*        \*        \*        \*        \*        \*

Article V -- Limitations on Benefits

    \*        \*        \*        \*        \*        \*        \*

5.05 A Participant may not receive more than $5,250 in Benefits under the Plan for the year in accordance with Code Section 127(a).

    \*        \*        \*        \*        \*        \*        \*

Article VII -- Named Fiduciary and Plan Administrator

7.01 Jeanne M. Vlock is hereby designated as the Plan Administrator and Named Fiduciary * * *.

During none of Vlock and Hammond's taxable years ended November 30, 2003, 2004, and 2005, was Sarina an employee or a former employee of Vlock and Hammond as defined in the educational assistance document. As a result, Sarina was not eligible during any of those years to receive any benefits under that document. Nonetheless, Vlock and Hammond paid to Sarina $5,250, $5,250, and $5,000 during its taxable years ended November 30, 2003, 2004, and 2005, respectively.[15] (We shall refer to the foregoing amounts that Vlock and Hammond paid to Sarina for tuition and other educational expenses as the educational assistance expenses.)

### Certain Payments Made by Vlock and Hammond Relating to Petitioners' Automobiles

On January 1, 2002, petitioners executed a document entitled "INSTALLMENT SALE AGREEMENT" (Lexus sale document). That document stated:

> The undersigned does hereby sell and transfer to Vlock & Hammond, Inc. all of their right, title and interest to the following:
>
> 1. 1996 Lexus automobile
>
> 2. Price: $20,000.00
>
> 3. Interest Rate: 10%
>
> 4. Number of Payments: 36

---

[15]From around September 2003 to around May 2007, Sarina was a student at the University of Kansas. During that time, Sarina's tuition, room and board, book, and other expenses at that university were approximately $18,000 a year.

        5.  Monthly Payment Amount:  $645.00[16]

        DATED:  January 1, 2002.

From January 1, 2002, through around the summer of 2005, Mr.

Vlock was the primary user of the 1996 Lexus automobile.  During

that time, Mr. Vlock used that automobile for both business and

personal purposes.

On December 1, 2002, petitioners executed another document

entitled "INSTALLMENT SALE AGREEMENT" (Suburban sale document).[17]

That document stated:

> The undersigned does hereby sell and transfer to
> Vlock & Hammond, Inc. all of their right, title and
> interest to the following:
>
>        1.  1999 Suburban automobile
>
>        2.  Price:  $20,000.00
>
>        3.  Interest Rate:  10%
>
>        4.  Number of Payments:  36

---

[16]The record does not establish whether Vlock and Hammond made any of the payments stated in the Lexus sale document. However, as discussed below, Vlock and Hammond claimed deductions for depreciation with respect to the 1996 Lexus automobile of $4,900, $2,950, and $1,152 in the returns that it filed for its taxable years ended Nov. 30, 2003, 2004, and 2005, respectively.

[17]The parties stipulated that petitioners executed the Suburban sale document on Jan. 1, 2002.  That stipulation is clearly contrary to the facts that we have found are established by the record, and we shall disregard it.  See Cal-Maine Foods, Inc. v. Commissioner, 93 T.C. 181, 195 (1989).  The record establishes, and we have found, that petitioners executed the Suburban sale document on Dec. 1, 2002.

>          5.   Annual Payment Amount:  $8,042.30, due on
>               January 1, 2004, January 1, 2005 and
>               January 1, 2006[18]

DATED:   December 1, 2002.

During the years at issue, Ms. Vlock was the primary user of the 1999 Suburban automobile.  During those years, Ms. Vlock used that automobile for both business and personal purposes.

On July 1, 2005, Vlock and Hammond purchased a 1999 Lexus automobile for $19,500.  From July 1, 2005, through the end of 2005, Mr. Vlock was the primary user of that automobile.[19]

Vlock and Hammond's Tax Returns

Vlock and Hammond filed Form 1120, U.S. Corporation Income Tax Return (Form 1120), for its taxable years ended November 30, 2003 (11/30/03 corporate return), November 30, 2004 (11/30/04 corporate return), and November 30, 2005 (11/30/05 corporate return).  During each of those taxable years, Vlock and Hammond derived all of its gross receipts from payments that Mr. Vlock made to Vlock and Hammond during each such year.  In its Forms 1120 for its taxable years ended November 30, 2003 through 2005,

---

[18]The record does not establish whether Vlock and Hammond made any of the payments stated in the Suburban sale document. However, as discussed below, Vlock and Hammond claimed a deduction under sec. 179 with respect to the 1999 Suburban automobile of $20,000 in the return it filed for its taxable year ended Nov. 30, 2003.

[19]The record does not disclose whether Mr. Vlock used the 1999 Lexus automobile for business purposes, personal purposes, or both.

Vlock and Hammond reported the following amounts as gross receipts for the year indicated:[20]

| Taxable Year Ended | Amount |
|---|---|
| Nov. 30, 2003 | $120,000 |
| Nov. 30, 2004 | [1]120,100 |
| Nov. 30, 2005 | 109,000 |

[1]In the 2004 Schedule C, petitioners claimed a deduction for management services of $120,000. The record does not establish why there is a $100 discrepancy between that amount and the amount that Vlock and Hammond reported as gross receipts in the 11/30/04 corporate return.

In its Forms 1120 for its taxable years ended November 30, 2003 through 2005, Vlock and Hammond claimed deductions for each of those years for, inter alia, the personal residence expenses, the cellular telephone expenses, the reimbursed food expenses, the reimbursed medical expenses, and the educational assistance expenses, as follows:

---

[20]See _supra_ note 9.

|  | Deductions Claimed for the Taxable Year Ended | | |
| --- | --- | --- | --- |
| Description | 11/30/03 | 11/30/04 | 11/30/05 |
| Reimbursed medical expenses | $4,595 | $6,873 | $997 |
| Other expenses | | | |
| Insurance | -- | 3,698 | 929 |
| Real property taxes | 3,484 | 3,592 | 4,114 |
| Repairs and maintenance | 3,972 | 4,335 | 2,061 |
| Telephone | 1,240 | 457 | -- |
| Utilities | 3,746 | 4,115 | 4,894 |
| Janitorial | 450 | -- | -- |
| Interest included in real estate installment document payments | 24,968 | 23,999 | 22,940 |
| Educational assistance expenses | 5,250 | 5,250 | 5,000 |
| Reimbursed food expenses | 5,681 | 5,463 | 8,481 |
| Cellular telephone expenses | 1,327 | 941 | 1,145 |

Vlock and Hammond attached Form 4562, Depreciation and Amortization, to the 11/30/03 corporate return, the 11/30/04 corporate return, and the 11/30/05 corporate return. In those forms, Vlock and Hammond claimed the following depreciation deductions and section 179 expenses with respect to, inter alia, petitioners' residence, certain of the personal residence expenses, the 1996 Lexus automobile, the 1999 Lexus automobile, and the 1999 Suburban automobile:

| Description | Amount Claimed for the Taxable Year Ended | | |
| --- | --- | --- | --- |
| | 11/30/03 | 11/30/04 | 11/30/05 |
| Section 179 expense deduction | [1]$22,975 | -- | [2]$2,960 |
| MACRS deductions for assets placed in service in prior tax years | [3]12,451 | [3]$11,856 | [3]11,481 |
| Listed property[4] | 4,900 | 2,950 | 1,152 |

[1]The sec. 179 expense deduction claimed in the 11/30/03 corporate return consisted of claimed expenses of $20,000 for the 1999 Suburban automobile, $1,800 that Vlock and Hammond paid for a sprinkler system installed at petitioners' residence, and $1,175 described as "DOORS".

[2]The sec. 179 expense deduction claimed in the 11/30/05 corporate return was with respect to the 1999 Lexus automobile.

[3]The MACRS deductions claimed in the 11/30/03, 11/30/04, and 11/30/05 corporate returns included $10,544 that Vlock and Hammond claimed as depreciation on petitioners' residence.

[4]The listed property deduction represented depreciation on the 1996 Lexus automobile that Vlock and Hammond claimed it used for business purposes 100 percent of the time.

During the summer of 2005, Vlock and Hammond sold the 1996 Lexus automobile to petitioners' daughter Sarina. Vlock and Hammond reported that sale in Form 4797, Sales of Business Property (Form 4797), that it attached to the 11/30/05 corporate return, as follows:

| Description | Amount |
| --- | --- |
| Gross sales price | [1]$5,000 |
| Depreciation allowed or allowable since acquisition | 9,002 |
| Cost or other basis, plus improvements and expense of sale | 20,000 |
| Gain or (loss) | (5,998) |

[1]The record does not establish whether Sarina paid to Vlock and Hammond the $5,000 that it reported as the gross sales price of the 1996 Lexus automobile in Form 4797 that it attached to the 11/30/05 corporate return.

In the 11/30/05 corporate return, Vlock and Hammond did not report any amount as recapture of depreciation with respect to the sale of the 1996 Lexus automobile to Sarina.

Vlock and Hammond attached Schedule L, Balance Sheets per Books, to the 11/30/03 corporate return, the 11/30/04 corporate return, and the 11/30/05 corporate return.  In each of those schedules, Vlock and Hammond reported the following total amounts of loans to stockholders outstanding at the beginning and end of each of those taxable years:

| Taxable Year Ended | Loan Balance at Beginning of Year | Loan Balance at End of Year |
|---|---|---|
| Nov. 30, 2003 | $2,315 | $17,001 |
| Nov. 30, 2004 | 17,001 | 41,476 |
| Nov. 30, 2005 | 41,476 | 26,268 |

Respondent's Examinations of
Petitioners and Vlock and Hammond

In June 2006, respondent commenced an examination of (1) petitioners' taxable years 2003 through 2005 and (2) Vlock and Hammond's taxable years ended November 30, 2003 through 2005.

On February 13, 2007, respondent sent to Vlock and Hammond two letters (no-change letters), one pertaining to its two taxable years ended November 30, 2003 and 2004, and the other pertaining to its taxable year ended November 30, 2005.  In each of those letters, respondent notified Vlock and Hammond that respondent had "completed the examination of your tax return for

the year(s)" to which each letter pertained and that respondent

"made no changes to your reported tax" for those years.

On March 22, 2007, respondent issued to petitioners a notice

of deficiency with respect to their taxable years 2003 through

2005 (2003-2005 notice). In that notice, respondent determined,

inter alia, (1) that the payments that Mr. Vlock made to Vlock

and Hammond during each of those years and for which petitioners

claimed a deduction for each such year are not deductible under

section 162(a) for each of those years[21] and (2) that the amounts

that Mr. Vlock paid to the Vlock daughters during 2003 are not

deductible under section 162(a) for that year. In the 2003-2005

notice, respondent also determined that petitioners are liable

for each of their taxable years at issue for the accuracy-related

penalty under section 6662(a).

OPINION

Petitioners bear the burden of proving that the determina-

tions in the 2003-2005 notice that remain at issue are

erroneous.[22] See Rule 142(a); Welch v. Helvering, 290 U.S. 111,

115 (1933).

---

[21]In the 2003-2005 notice, respondent advanced an alterna-
tive determination with respect to constructive dividends. See
infra note 27.

[22]Petitioners do not claim that the burden of proof shifts
to respondent under sec. 7491(a). On the record before us, we
find that the burden of proof does not shift to respondent under
that section.

Before turning to the issues presented, we shall address the testimonial evidence on which petitioners rely to satisfy their burden of proof with respect to each of those issues.[23] That testimonial evidence consists of the respective testimonies of Mr. Vlock and Ms. Vlock.

We found the testimony of Mr. Vlock to be in certain material respects questionable, vague, self-serving, and/or evasive. We shall not rely on Mr. Vlock's testimony to establish petitioners' respective positions with respect to the issues to which that testimony pertained.

During Ms. Vlock's testimony, she acknowledged that petitioners had the following tax-avoidance objectives in having her incorporate Vlock and Hammond: (1) Petitioners did not want Ms. Vlock to receive cash wages for the services that she was to perform for Mr. Vlock's insurance business because she would have to report any such wages as income and pay tax on that income, and (2) petitioners wanted Vlock and Hammond to pay virtually all of petitioners' personal living expenses with funds which Mr. Vlock was to pay to Vlock and Hammond and for which petitioners were to claim tax deductions. We found the remaining testimony of Ms. Vlock to be in certain material respects questionable, vague, and/or self-serving. We shall not rely on Ms. Vlock's

---

[23]Petitioners also rely on certain documentary evidence to satisfy their burden of proof with respect to the issues presented. We shall address that documentary evidence below.

remaining testimony to establish petitioners' respective positions with respect to the issues to which that testimony pertained.

Claimed Deductions for Mr. Vlock's
Payments at Issue to Vlock and Hammond

It is the position of petitioners that Mr. Vlock's payments to Vlock and Hammond during each of the years at issue are deductible under section 162(a) for each of those years.  In support of that position, petitioners argue that respondent may not deny them the deductions that they are claiming for those payments because when respondent issued the no-change letters to Vlock and Hammond, respondent acknowledged that those payments are income to Vlock and Hammond and that therefore they are deductible by petitioners.

We reject petitioners' argument about the no-change letters that respondent issued to Vlock and Hammond.  Those no-change letters did not contain a determination by respondent that Mr. Vlock's payments to Vlock and Hammond during each of the years at issue are includible in Vlock and Hammond's income.[24]  In the no-change letters in question, respondent notified Vlock and Hammond that respondent had "completed the examination of your tax return" and "made no changes to your reported tax."

---

[24]See Miller v. Commissioner, T.C. Memo. 2001-55.

Respondent could have made changes to Vlock and Hammond's taxable years ended November 30, 2003 through 2005, even after respondent issued to Vlock and Hammond the respective no-change letters in question pertaining to those taxable years.[25]  We conclude that petitioners may not rely on those no-change letters to establish that Mr. Vlock's payments to Vlock and Hammond during each of the years at issue are includible in Vlock and Hammond's income, let alone that respondent had determined that those payments are deductible by petitioners for each of those years.[26]

In further support of their position that Mr. Vlock's payments to Vlock and Hammond during each of the years at issue are deductible under section 162(a) for each of those years, petitioners argue that (1) after acquiring the additional clients, Mr. Vlock decided that he needed additional assistance in order to maintain and improve Mr. Vlock's insurance business;

_____

[25]The Commissioner of Internal Revenue generally may issue a notice of deficiency to a taxpayer for a taxable year of the taxpayer even after issuing to that taxpayer a no-change letter pertaining to the same taxable year.  See Opine Timber Co. v. Commissioner, 64 T.C. 700, 712 (1975), affd. without published opinion 552 F.2d 368 (5th Cir. 1977); Lawton v. Commissioner, 16 T.C. 725, 727 (1951).  Petitioners do not assert that that general rule does not apply in this case.

[26]Petitioners could have avoided a potential whipsaw situation for themselves and Vlock and Hammond by having Vlock and Hammond file protective claims for refund for each of its taxable years ended Nov. 30, 2003 through 2005, on the ground that Vlock and Hammond did not have any income during each of those years. Petitioners apparently chose not to file any such claims.

(2) Ms. Vlock incorporated Vlock and Hammond for the purpose of providing that assistance to Mr. Vlock's insurance business; (3) during each of the years at issue, Vlock and Hammond, pursuant to the purported management agreement, provided to Mr. Vlock's insurance business certain assistance with respect to marketing and client servicing; (4) during each of the years at issue, Mr. Vlock made Mr. Vlock's payments to Vlock and Hammond in exchange for Vlock and Hammond's services; and (5) the amount that Mr. Vlock paid to Vlock and Hammond during each of the years at issue for its services was reasonable.

It is the position of respondent that Mr. Vlock's payments to Vlock and Hammond during each of the years at issue are not deductible under section 162(a) for each of those years.[27] That is because, according to respondent, during the years at issue:

> Joseph Vlock and Vlock and Hammond, Inc. * * * executed a management contract whereby Mr. Vlock paid $10,000 a month (2003, 2004 and most of 2005, and later reduced to $7,500 a month in October 2005) for alleged management and consulting services.

---

[27]Consistent with the 2003-2005 notice, respondent argues in the alternative that if we were to find that petitioners are entitled to deduct under sec. 162(a) for each of their taxable years 2003 through 2005 Mr. Vlock's payments to Vlock and Hammond during each of those years, certain payments that Vlock and Hammond made for petitioners' personal expenses and certain disbursements that Vlock and Hammond made on their behalf are includible as constructive dividends in petitioners' gross income for each of those years. In the light of our holding below that petitioners are not entitled to deduct under sec. 162(a) for each of their taxable years 2003 through 2005 Mr. Vlock's payments to Vlock and Hammond during each of those years, we need not address respondent's alternative argument.

Petitioners deducted the management fees Joseph Vlock paid to Vlock and Hammond, Inc. in the amounts of $120,000 (2003 and 2004) and $109,000 (2005) on their income tax returns. Vlock and Hammond, Inc. utilized Mr. Vlock's payments as a source of funds to pay petitioners personal living expenses * * *.

Petitioners planned this transaction to create a device to deduct their personal living expenses. Mr. Vlock's payments to Vlock and Hammond, Inc. are not deductible business expenses.

In order to carry their burden of proving that Mr. Vlock's payments to Vlock and Hammond during each of the years at issue are deductible under section 162(a) for each of those years, petitioners must show that those payments are ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business. See sec. 162(a). In order to establish that Mr. Vlock's payments to Vlock and Hammond during each of the years at issue are ordinary and necessary expenses for each of those years, petitioners must show that those payments (1) constituted "salaries or other compensation for personal services actually rendered", sec. 1.162-7(a), Income Tax Regs., and (2) were reasonable, see id. In order to establish that Mr. Vlock's payments to Vlock and Hammond during each of the years at issue were compensation for services that Vlock and Hammond in fact rendered to Mr. Vlock's insurance business, petitioners must show that Mr. Vlock made those payments during each of those years for services that Vlock and Hammond, not Ms. Vlock in her individual capacity, in fact rendered to that

business.   In order to establish that Mr. Vlock's payments to Vlock and Hammond during each of the years at issue were reasonable, petitioners must show that those payments during each of those years constituted "only such amount as would ordinarily be paid for like services by like enterprises under like circumstances."  Sec. 1.162-7(b)(3), Income Tax Regs.

In an attempt to establish that during each of the years at issue Vlock and Hammond in fact rendered services to Mr. Vlock's insurance business, petitioners rely on the respective testimonies of Mr. Vlock and Ms. Vlock and certain documentary evidence. As we stated above, we shall not accept those testimonies to establish petitioners' contention that during each of the years at issue Vlock and Hammond in fact performed services for Mr. Vlock's insurance business.  With respect to the documentary evidence on which petitioners rely, that evidence includes the purported management agreement, the purported employment agreement, the Vlock insurance business annual business documents, and the business potential documents.

We turn first to the purported management agreement.  The purported management agreement is a self-serving attempt by petitioners to create a paper trail to bolster the chances that they would succeed in achieving their tax-avoidance objectives. Petitioners have not shown that that purported agreement has any economic reality beyond tax planning.  On the record before us,

we find that the purported management agreement does not establish that during each of the years at issue Mr. Vlock made Mr. Vlock's payments to Vlock and Hammond for services that Vlock and Hammond in fact rendered during each of those years to Mr. Vlock's insurance business under that purported agreement.

We turn next to the purported employment agreement. That agreement is another self-serving attempt by petitioners to create a paper trail to bolster the chances that they would succeed in achieving their tax-avoidance objectives. Petitioners have not shown that that purported agreement has any economic reality beyond tax planning. On the record before us, we find that the purported employment agreement does not establish that during each of the years at issue Ms. Vlock performed any services for Vlock and Hammond under that purported agreement.

We turn next to the Vlock insurance business annual business documents on which petitioners rely. The December 2002 annual business document second page was entitled "JOE VLOCK 2002 BUSINESS PLAN, PERFORMED BY VLOCK/HAMMOND" and stated:

Specific Goals for 2002

1. Chairman's Council

2. Recreation Time (Family)

3. Education

4. Consistent Growth

5. Prioritize Phone List

6. Keep Notes in File Neat/Clean up Files

7. Workable Plan

8. Creative Time

9. Time Management

The December 2002 annual business document second page was the only page on which Mr. Vlock referred in the December 2002 annual business document to "VLOCK/HAMMOND".[28] We believe that Mr. Vlock's inclusion of "VLOCK/HAMMOND" in the title of the December 2002 annual business document second page was a part of petitioners' effort to create a paper trail to bolster the chances that they would succeed in achieving their tax-avoidance objectives. In the December 2002 annual business document, Mr. Vlock did not set forth any specific goals that he expected Vlock and Hammond to accomplish, or any specific tasks that he expected Vlock and Hammond to perform, with respect to Mr. Vlock's insurance business.[29] On the record before us, we find that the December 2002 annual business document does not establish that during any of the years at issue Vlock and Hammond in fact rendered services to Mr. Vlock's insurance business.

---

[28]See supra note 3.

[29]We note that certain of the goals that Mr. Vlock set forth in the December 2002 plan, such as "Creative Time" and "Recreation Time (Family)", do not appear to be related at all to Mr. Vlock's insurance business.

In the January 2004 annual business document, Mr. Vlock did not refer to Vlock and Hammond.  Instead, Mr. Vlock referred in that document to "Jeanne" (i.e., Ms. Vlock) the following four times:  (1) In a section entitled "**Opportunities**", Mr. Vlock stated that "Jeanne is committed to co-ordinate all marketing and case preparation and public relations with clients"; (2) in a section entitled "**Threats**", Mr. Vlock asked:  "Can Joe & Jeanne work together"; and (3) in a section entitled "**Key Strategies for Planning Year**", Mr. Vlock stated (a) that he was to "**Spend** 2-3 hours with Jeanne coordinating monthly seminars, case presenta- tions and client appreciation workshops", and (b) "**Jeanne** to coordinate center of influence appointments."  Mr. Vlock did not indicate in the January 2004 annual business document that the four references in that document to "Jeanne" were to Ms. Vlock acting on behalf of Vlock and Hammond.  Nor did Mr. Vlock refer in the January 2004 annual business document to "Jeanne" in such a way as to establish that, if and when Ms. Vlock were to perform services for Mr. Vlock's insurance business, she would be acting on behalf of Vlock and Hammond.  On the record before us, we find that the January 2004 annual business document does not establish that during any of the years at issue Vlock and Hammond in fact rendered services to Mr. Vlock's insurance business.  In fact, that document tends to show that during 2004 Ms. Vlock performed

services for Mr. Vlock's insurance business in her individual capacity, and not on behalf of Vlock and Hammond.[30]

In the January 2005 annual business document, Mr. Vlock did not refer to Vlock and Hammond or to Ms. Vlock. In that document, Mr. Vlock set forth goals and objectives for Mr. Vlock, Richard Ness, and a person identified in that document as "Jess". In the January 2005 annual business document, Mr. Vlock also set forth analyses of the strengths and weaknesses of, the opportunities for, and the threats to Mr. Vlock and Richard Ness. In that document, Mr. Vlock did not assign any tasks or goals to Vlock and Hammond or to Ms. Vlock acting on behalf of Vlock and Hammond and did not indicate that Vlock and Hammond or Ms. Vlock acting on behalf of Vlock and Hammond was to assist Mr. Vlock, Richard Ness, or "Jess" in achieving any of the goals and objectives that Mr. Vlock set forth in that document for each of them. On the record before us, we find that the January 2005 annual business

---

[30]Like the January 2004 annual business document, the minutes of the meetings of the Vlock and Hammond board also tend to show that during each of the years at issue Vlock and Hammond did not in fact render services to Mr. Vlock's insurance business. None of those minutes indicated that the Vlock and Hammond board discussed the purported management agreement, the 2005 amendment, the purported employment agreement, the services that the purported management agreement stated that Vlock and Hammond was to provide to Mr. Vlock's insurance business, or the services that the purported employment agreement stated Ms. Vlock was to provide to Vlock and Hammond. On the record before us, we find that the minutes of the meetings of the Vlock and Hammond board do not establish that Vlock and Hammond in fact rendered services during any of the years at issue to Mr. Vlock's insurance business.

document does not establish that during any of the years at issue Vlock and Hammond in fact rendered services to Mr. Vlock's insurance business.

We turn finally to the business potential documents on which petitioners rely to establish that during each of the years at issue Vlock and Hammond in fact rendered services to Mr. Vlock's insurance business. Both of those documents were entitled "ASSESS YOUR BUSINESS POTENTIAL REPPORT [sic] - 2003, JOE VLOCK, CLU, CHFC/VLOCK & HAMMOND". Each of those titles contained the only reference to Vlock and Hammond in each of those documents. Each of the business potential documents contained several statements that were addressed directly to Mr. Vlock, including the following:

> Joe, here is my summary of your needs for coaching and activities to go to the next level. All of these actions and systems could be set up through customized coaching.
>
> OVERVIEW OF ACTIONS NEEDED AND YOUR COACHING NEEDS
>
> - Clear Goals: for 1 year and 1 quarter
> - Clear Marketing Systems: Target market business/estate, build strong client centers of Influence, use your speaking skills.
> - Better staff utilization: train Jean[31] to be your marketing coordinator.
> - Polish your office systems: have less service interruptions.
> - Better time management: plan and coordinate your day, week, and month; deal with your time wasters.

---

[31]See _supra_ note 4.

- Get out of your comfort zone:  stay "focused" on your insurance business.
- Increase your sales activity and case size through target marketing.
- Joe, good things are ahead for you and your staff.  You can go to the next level.

The reference to "Jean" in the above-quoted statement was the only reference to Ms. Vlock in each of the business potential documents.  The author of each of those documents did not indicate therein that each such reference was to Ms. Vlock acting on behalf of Vlock and Hammond.  Nor did the author refer in either of the business potential reports to Ms. Vlock in such a way as to establish that, if and when Ms. Vlock were to perform services for Mr. Vlock's insurance business, she would be acting on behalf of Vlock and Hammond.

Except for the title of each of the business potential documents that referred to Vlock and Hammond, none of those documents suggests that the author of each of those documents, who is not identified in the record, understood that Mr. Vlock was using, or intended to use, the services of Vlock and Hammond to achieve the goals and objectives identified in those documents.  Moreover, we doubt that that author was the individual who included the reference to Vlock and Hammond in each of those titles.  We believe that petitioners may have altered the title of each of the business potential documents to include a reference to Vlock and Hammond in order to bolster the chances that they would succeed in achieving their tax-avoidance objectives.

On the record before us, we find that the business potential documents do not establish that during any of the years at issue Vlock and Hammond in fact rendered services to Mr. Vlock's insurance business. In fact, those documents tend to show that during 2003 Ms. Vlock performed services for Mr. Vlock's insurance business in her individual capacity, and not on behalf of Vlock and Hammond.

Based upon our examination of the entire record before us, we find that petitioners have failed to carry their burden of establishing that during each of the years at issue Vlock and Hammond in fact rendered services to Mr. Vlock's insurance business. On that record, we further find that petitioners have failed to carry their burden of establishing that Mr. Vlock's payments to Vlock and Hammond during each of those years consti- tuted compensation for services that Vlock and Hammond in fact rendered to Mr. Vlock's insurance business. See sec. 1.162-7(a), Income Tax Regs. On the record before us, we further find that petitioners have failed to carry their burden of establishing that Mr. Vlock's payments to Vlock and Hammond during each of the years at issue are ordinary and necessary expenses paid or incurred during each of those years in carrying on Mr. Vlock's insurance business.[32] See sec. 162(a). On that record, we find

_____

[32]Assuming arguendo that we had found that Mr. Vlock's payments to Vlock and Hammond during each of the years at issue
(continued...)

that petitioners have failed to carry their burden of establish-

---

[32](...continued)
constituted compensation for services that Vlock and Hammond in fact rendered during each of those years to Mr. Vlock's insurance business, on the record before us, we would find that petitioners have failed to carry their burden of establishing that those payments during each of those years were what "would ordinarily be paid for like services by like enterprises under like circumstances", see sec. 1.162-7(b)(3), Income Tax Regs., and thus were reasonable in amount. In arriving at the $10,000 amount stated in sec. 3 of the purported management agreement, neither Mr. Vlock nor Ms. Vlock consulted an accountant, business manager, or compensation expert. Although Ms. Vlock consulted Mr. Pechacek, the attorney whom petitioners retained for the purpose of assisting Ms. Vlock in incorporating Vlock and Hammond and drafting certain documents for it, the record does not establish what he told her. Mr. Vlock testified that, in arriving at the $10,000 amount stated in sec. 3 of the purported management agreement, he "calculated about 50- to $60,000 to hire a full-time person with a tremendous amount of knowledge, and that's without benefits, and then included rent, supplies, utilities, things such as that that I'd have to provide." Petitioners have failed to carry their burden of establishing that during each of the years at issue it would have cost Mr. Vlock $50,000 to $60,000 to hire a full-time employee to provide to Mr. Vlock's insurance business the services that Ms. Vlock provided to it during each of the years at issue, let alone that he would have paid an additional $60,000 to $70,000 for "benefits * * * rent, supplies, [and] utilities". Moreover, we have found that during 2003 Mr. Vlock paid to Paul Jensen, the only full-time employee of Mr. Vlock's insurance business during that year, total wages of $29,475.84 for serving as a receptionist and for performing certain administrative and secretarial tasks for that business. Without regard to the $120,000 that the purported management agreement stated that Mr. Vlock was to pay to Vlock and Hammond during each of the years at issue, the $29,475.84 that Mr. Vlock paid to Paul Jensen during 2003 was the largest amount that Mr. Vlock paid during any of those years to any individual who performed services for Mr. Vlock's insurance business during any of those years. Furthermore, without regard to the $120,000 that the purported management agreement stated that Mr. Vlock was to pay to Vlock and Hammond during each of the years at issue, the total compensation that Mr. Vlock paid during all the years at issue to all individuals who performed services for Mr. Vlock's insurance business during those years was $116,578.16.

ing that Mr. Vlock's payments to Vlock and Hammond during each of the years at issue are deductible under section 162(a) for each of those years.

Claimed Deduction for Payments to the Vlock Daughters

It is the position of petitioners (1) that the payments that Mr. Vlock made during 2003 to the Vlock daughters Sarina and Jennifer were for services that they in fact rendered to Mr. Vlock's insurance business during that year and (2) that there-fore those payments are deductible under section 162(a) for that year. In support of that position, petitioners argue that during 2003 the Vlock daughters performed certain administrative and secretarial tasks for Mr. Vlock's insurance business and that during that year Mr. Vlock paid them for performing those tasks. It is the position of respondent that petitioners have not carried their burden of establishing that during 2003 the Vlock daughters in fact performed any services for Mr. Vlock's insur-ance business.

In order to carry their burden of proving that the payments that Mr. Vlock made during 2003 to the Vlock daughters are deductible under section 162(a) for that year, petitioners must show that those payments are ordinary and necessary expenses paid or incurred during that taxable year in carrying on any trade or business. See sec. 162(a). In order to establish that those payments are ordinary and necessary expenses for their taxable

year 2003, petitioners must show that those payments constituted "salaries or other compensation for personal services actually rendered".[33]  Sec. 1.162-7(a), Income Tax Regs.  In order to do so, petitioners must establish that during 2003 Mr. Vlock made payments to the Vlock daughters for services that the Vlock daughters in fact rendered to Mr. Vlock's insurance business.

In an attempt to establish that the Vlock daughters in fact rendered services during 2003 to Mr. Vlock's insurance business, petitioners rely on Mr. Vlock's testimony, which we have not accepted, and certain documentary evidence.  The documentary evidence on which petitioners rely consists principally of a weekly calendar for 2003 (2003 calendar).[34]

Mr. Vlock testified that on each page of the 2003 calendar he made certain handwritten notations that showed (1) the name(s) of his daughter(s) (i.e., Sarina and/or Jennifer) who had worked for Mr. Vlock's insurance business during each week, (2) the day(s) of each week on which Sarina and/or Jennifer had worked, (3) the number of hours on such day(s) that Sarina and/or Jennifer had worked, and (4) the amount of money that Sarina

---

[33]In the event that we were to find that Mr. Vlock made payments to the Vlock daughters during 2003 for services that they in fact rendered during that year to Mr. Vlock's insurance business, respondent does not argue that those payments were not reasonable in amount.  See sec. 1.162-7(a), Income Tax Regs.

[34]Each page of the 2003 calendar displayed the seven days of each week during 2003.

and/or Jennifer had earned during each week.  There is no reliable evidence in the record that establishes when Mr. Vlock made the handwritten notations on the 2003 calendar relating to the Vlock daughters.  Those notations are nothing more than self-serving notations on which we are unwilling to rely.[35]

Based upon our examination of the entire record before us, we find that petitioners have failed to carry their burden of establishing that during 2003 the Vlock daughters in fact rendered services to Mr. Vlock's insurance business.  On that record, we further find that petitioners have failed to carry their burden of establishing that the payments that Mr. Vlock made during 2003 to the Vlock daughters constituted compensation for services that they in fact rendered to Mr. Vlock's insurance business.  See sec. 1.162-7(a), Income Tax Regs.  On the record before us, we further find that petitioners have failed to carry their burden of establishing that those payments are ordinary and necessary expenses paid or incurred during 2003 in carrying on Mr. Vlock's insurance business.  See sec. 162(a).  On the record before us, we find that petitioners have failed to carry their burden of establishing that the payments that Mr. Vlock made

_____

[35]We note that petitioners did not call Sarina and/or Jennifer to testify in support of petitioners' position that Sarina or Jennifer in fact rendered services during 2003 to Mr. Vlock's insurance business.

during 2003 to the Vlock daughters are deductible under section 162(a) for petitioners' taxable year 2003.

Accuracy-Related Penalty

In the 2003-2005 notice, respondent determined that petitioners are liable for each of their taxable years 2003 through 2005 for the accuracy-related penalty under section 6662(a). According to respondent, petitioners are liable for that penalty for each of those years because of (1) negligence or disregard of rules or regulations under section 6662(b)(1) or (2) a substantial understatement of tax under section 6662(b)(2).

Section 6662(a) imposes an accuracy-related penalty equal to 20 percent of the underpayment of tax attributable to, inter alia, (1) negligence or disregard of rules or regulations, sec. 6662(b)(1), or (2) a substantial understatement of tax, sec. 6662(b)(2).

The term "negligence" in section 6662(b)(1) includes any failure to make a reasonable attempt to comply with the Code. Sec. 6662(c). Negligence has also been defined as a failure to do what a reasonable person would do under the circumstances. Leuhsler v. Commissioner, 963 F.2d 907, 910 (6th Cir. 1992), affg. T.C. Memo. 1991-179; Antonides v. Commissioner, 91 T.C. 686, 699 (1988), affd. 893 F.2d 656 (4th Cir. 1990). The term "disregard" includes any careless, reckless, or intentional disregard. Sec. 6662(c).

For purposes of section 6662(b)(2), an understatement is equal to the excess of the amount of tax required to be shown in the tax return over the amount of the tax shown in the tax return, sec. 6662(d)(2)(A), and is substantial in the case of an individual if it exceeds the greater of 10 percent of the tax required to be shown or $5,000, sec. 6662(d)(1)(A).

The accuracy-related penalty under section 6662(a) does not apply to any portion of an underpayment if it is shown that there was reasonable cause for, and that the taxpayer acted in good faith with respect to, such portion. Sec. 6664(c)(1). The determination of whether the taxpayer acted with reasonable cause and in good faith depends on the pertinent facts and circumstances, including the taxpayer's efforts to assess such taxpayer's proper tax liability, the knowledge and experience of the taxpayer, and the reliance on the advice of a professional, such as an accountant. Sec. 1.6664-4(b)(1), Income Tax Regs. Reliance on the advice of a professional does not necessarily demonstrate reasonable cause and good faith unless, under all the circumstances, such reliance was reasonable and the taxpayer acted in good faith. Id.

Petitioners argue that they are not liable for each of their taxable years 2003 through 2005 for the accuracy-related penalty under section 6662(a) because:

> Petitioners did not substantially understate income tax
> and did not act negligently or disregard rules or

> regulations. Instead, Petitioners had reasonable cause
> and acted in good faith. Petitioners have proven that
> their transactions were related to legitimate business
> activities, and were not a scheme to deduct Petition-
> ers' personal expenses. Petitioners are not liable for
> accuracy-related penalties and Respondent has not
> sustained its burden of proof.

It appears that petitioners believe that respondent has the burden of proof with respect to the accuracy-related penalties at issue. Petitioners are wrong. Respondent bears only the burden of production with respect to those penalties. See sec. 7491(c). To meet respondent's burden of production, respondent must come forward with sufficient evidence showing that it is appropriate to impose the accuracy-related penalty under section 6662(a) for each of petitioners' taxable years 2003 through 2005. See Higbee v. Commissioner, 116 T.C. 438, 446 (2001). Although respondent bears the burden of production with respect to the accuracy-related penalties at issue, respondent "need not introduce evidence regarding reasonable cause, substantial authority, or similar provisions. * * * the taxpayer bears the burden of proof with regard to those issues." Id.

We address only whether there is a substantial understatement in petitioners' tax for each of the years at issue. That is because resolution of that question resolves the issue of whether petitioners are liable for each of those years for the accuracy-related penalty under section 6662(a). The accuracy-related penalty that respondent determined for each of petitioners'

- 64 -

taxable years 2003 through 2005 is imposed on an underpayment of tax for each of those years that is attributable to a substantial understatement of tax resulting principally from respondent's determinations to disallow petitioners' claimed deduction for Mr. Vlock's payments to Vlock and Hammond for each of those years. We have sustained those determinations. On the record before us, we find that respondent has satisfied respondent's burden of production under section 7491(c) with respect to the accuracy-related penalty under section 6662(a) that respondent determined for each of petitioners' taxable years 2003 through 2005.

As we understand it, petitioners' only argument in support of their position that they are not liable for each of their taxable years 2003 through 2005 for the accuracy-related penalty is that they are entitled to the deduction that they claimed for Mr. Vlock's payments to Vlock and Hammond for each of those years. As a result, according to petitioners, they did not understate their taxes for those respective taxable years. We have found that petitioners are not entitled to those deductions. On the record before us, we find that petitioners have failed to carry their burden of establishing that there was no substantial understatement of tax for each of the years at issue. See sec. 6662(b)(2), (d)(1)(A), (2)(A).

Petitioners make no argument that they reasonably relied on the advice of a professional, such as Mr. Pechacek or an accoun-

tant, to support their claim that they had reasonable cause for, and acted in good faith with respect to, any portion of the understatement of tax for each of the years at issue.  See sec. 1.6664-4(b)(1), Income Tax Regs.

On the record before us, we find that petitioners have failed to carry their burden of establishing that there was reasonable cause for, and that they acted in good faith with respect to, any portion of the understatement in tax for each of the years at issue.

Based upon our examination of the entire record before us, we find that petitioners have failed to carry their burden of establishing that they are not liable for each of their taxable years 2003 through 2005 for the accuracy-related penalty under section 6662(a).

We have considered all of the contentions and arguments of the parties that are not discussed herein, and we find them to be without merit, irrelevant, and/or moot.

To reflect the foregoing,

<u>Decision will be entered for respondent</u>.